WISE, Appellant, *v.* LEVINSON et al., Respondents.

(No. 8,015.)

(Submitted March 7, 1940. Decided April 22, 1940.)

[101 Pac. (2d) 1012.]

Messrs. *Ralph J. Anderson, Howard C. Gee, J. C. Allen, H. L. Maury* and *A. G. Shone,* for Appellant, submitted a brief; *Mr. Maury* and *Mr. Gee* argued the cause orally.

*Mr. H. L. DeKalb* and *Messrs. Weir, Clift & Bennett,* for Respondents, submitted a brief; *Mr. T. B. Weir* argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

This is an appeal from a judgment entered for the defendants in the district court of Fergus county. The facts of the case are involved; however, for the determination of the questions raised on the appeal, the following résumé of the transactions involved should be sufficient:

Beginning in 1926, the plaintiff Wise was associated with one of the defendants, Levinson, in a copartnership the chief business of which was to handle and deal in sheep and lambs. In addition to this business the partnership was interested in mining enterprises. However, with the exception of the particular transactions out of which this case arose, no details were given at the trial as to dealings involving anything but livestock matters.

Some time during the summer of 1927, while Wise and Levinson were actively engaged in carrying on the business of the partnership, they became interested in the stock of the Ruby Gulch Mining Company. Figures were quoted to them by the representatives of the Phillips estate, the owner of 60 per cent. of the issued stock, for its interest in the mine. Successive quotations were made until the price finally came down to $10,000. Both Levinson and Wise inspected the mining properties and discussed the matter with the Phillips heirs.

The partnership carried a checking account in a Lewistown bank and the testimony is that there were quite large sums of money on deposit at all times subject to withdrawal by either of the partners, but there is no testimony that any sums were paid from the bank account in the purchase of this mining stock. Charles Whitcomb, now deceased, had a verbal option from the Phillips heirs covering the stock in question. Levinson's testimony is that he paid to Whitcomb some $250 for a release of that option to clear the way for the purchase of the stock. In July of 1927, when Levinson paid the $250 to Whitcomb, which Levinson said came from his pocket and which he "presumed" was money "of Wise and myself," Levinson had discussed the proposition with his uncle, Mose Zimmerman, and Zimmerman, with. Levinson, talked to Walter Phillips about the deal. After securing the release of the Whitcomb option of which Zimmerman, so far as the testimony shows, apparently had no knowledge, Zimmerman, with Simon Meyers, visited the mine, and within a short time after the inspection of the premises by them, they, together- with Levinson, Whitcomb and Walter and Ben Phillips, went to Helena where an option agreement was prepared and executed whereby the representatives of the Phillips estate agreed to sell 60,000 shares of the capital stock in the Ruby Gulch Mining Company to Simon Meyers and Mose Zimmerman. At the same time Benjamin M. Phillips, one of the representatives of the Phillips estate, gave an option to the same purchasers for 500 shares of the Ruby Gulch Mining Company stock which he owned personally. On the same day Meyers and Zimmerman wrote a letter to the National Bank of Montana, offering to pay a certain note owed by Whitcomb to that bank, which note was secured by 27,000 shares of stock of the mining company owned by Whitcomb. This note was afterwards paid by Meyers and Zimmerman, and the terms of the option agreement were carried out and the agreed purchase price was paid, one-half by Zimmerman and the other half by Meyers. On the same day, or the next day after the execution of the option, Meyers and Zimmerman executed a memorandum as follows:

"Placer Hotel, Helena, Montana.
"M. Levinson and J. E. McDonald.

"We agree to give you as commission for your services on purchase of stock in Ruby Gulch Mining Company in the event we purchase the same—25% of any profit we make on same.

"SIMON MEYERS

"MOSE ZIMMERMAN."

The J. E. McDonald mentioned in the above memorandum was a partner acquired by Levinson prior to the time Zimmerman and Meyers together visited the mining property, and he assisted Levinson in showing the mining property, and Levinson in his testimony said that McDonald was equally interested in the matter with him.

Subsequently, in 1928, Levinson wrote a letter to Meyers demanding a more definite agreement as to his interest in the mining venture, and in this letter he stated that it was originally agreed that he and McDonald were to have one-fourth of the stock of the mine. On June 27 of the same year, Meyers wrote Levinson a letter in which he stated that Levinson and McDonald were to have only an interest in the profits, according to the memorandum above set out, and on July 12, 1928, an agreement was entered into between Zimmerman and Meyers, on the one hand, and McDonald and Levinson, on the other, whereby it was agreed that McDonald and Levinson were to get 25 per cent. interest in the profits accruing from the mining stock deal.

In the complaint it is alleged that the funds used in the purchase of 69 per cent. of the capital stock of the mining company were partnership funds belonging to Levinson and Wise, and that the purchase was made by Levinson, and that Zimmerman and Levinson, in order to cheat and defraud the plaintiff, entered into a conspiracy whereby Levinson transferred the stock to Zimmerman, although Zimmerman had no interest in it and knew of plaintiff's alleged interest in the transaction.

The defendants, in addition to Levinson and the Ruby Gulch Mining Company, a corporation, are assignees of the stock originally purchased by Zimmerman and Meyers, and the complaint

alleges knowledge on their part of the alleged plan of Levinson and Zimmerman to defraud the plaintiff.

On the trial no proof was offered to sustain the allegation that partnership funds were used in the purchase by Zimmerman and Meyers of the stock in question. By the testimony of Levinson it is sought to be proved that the transaction was really one wherein Meyers and Zimmerman loaned the purchase price to Levinson and Wise, who were to have the privilege of taking up as much of the stock as they wished by paying to Zimmerman and Meyers the pro rata portion of the original purchase price, or that they might secure all of the stock by payment of the full purchase price plus six per cent. interest.

Many transactions took place from the time of the original acquisition of the stock by Zimmerman and Meyers to the date of the trial: Transfers from Zimmerman to his son-in-law and from Meyers to Zimmerman's son-in-law, and eventually a transfer of the stock in question to the defendants other than Levinson and the mining company.

From August, 1927, to 1933, Meyers and Zimmerman from their own funds financed the company, paying the taxes, watchman's salary, located new mining claims and made many efforts to sell the property.

In 1928 Wise filed a complaint against Levinson for a partnership accounting, and as a result of the action an interlocutory order impounding and placing in custody of the court the properties of the partnership was made. In 1936 the partnership action was continued with Levinson defaulting, and a judgment was entered in the accounting action finding that plaintiff was the owner of 345,000 shares of the capital stock of the Ruby Gulch Mining Company. Great stress is laid by the plaintiff on the effect of the *lis pendens* and the service of notice of the assignees of Zimmerman of the accounting suit pending in the district court for the purpose of showing knowledge on the part of defendants of Wise's claim.

The specifications of error cover, first, the entering of judgment in favor of defendants; second, that the court erred in making the following findings of fact which may be briefly sum-

marized as (a) in Finding No. 3, that the money paid for the stock in question was paid by Meyers and Zimmerman from the personal funds of each; (b) in Finding No. 6, that the contract alluded to heretofore, made on July 12, 1928, expressed the whole of the agreement between Meyers and Zimmerman, on the one hand, and Monte Levinson, on the other, with regard to the stock in question, and that Levinson had no other interest in the stock than that set out in the contract; (c) in Finding No. 8, that Zimmerman and Meyers never did lend or promise to lend or advance to Levinson and Wise the purchase price of the stock; (d) in Finding No. 9, that Zimmerman and Meyers did never promise or agree to allow Levinson and Wise to purchase any of this stock at cost plus 6 per cent.; (e) in Finding No. 10, that no money or anything of value belonging to the partnership of Levinson and Wise was used for the purchase of the stock; (f) in Finding No. 12, that nothing was done by Meyers or Zimmerman, or any of the defendants, for the purpose of defrauding or wronging the plaintiff; (g) that none of the defendants, other than Levinson, formed or entered into any conspiracy for the purpose of defrauding plaintiff; (h) in Finding No. 17, that defendant Trauerman in purchasing the stock from the executors of the Zimmerman estate and from Zimmerman's son-in-law was not acting in behalf of the plaintiff, and that plaintiff furnished no part of the money and had no right or interest in the stock secured thereby; (i) in Finding No. 18, that Wise did not bring any action prior to the present one to assert the claim he now advances; and (j) in Finding No. 20, that the cause of action was not prosecuted against Levinson.

The third exception deals with the following conclusions of law made by the trial court: (a) That plaintiff was guilty of laches barring the suit; (b) that plaintiff has not now and never has had any right, title, interest or claim, either at law or in equity, of, in or to the stock in question, nor the proceeds thereof; (c) that plaintiff failed to prove any conspiracy as alleged, or otherwise; and (d) that plaintiff should take nothing by his complaint, and that judgment be entered against him for costs.

The appeal presents a situation often before this court, i. e., as to whether or not there is any evidence here sufficient to sustain the trial court. As this court said, in *In re Sales' Estate,* 108 Mont. 202, 89 Pac. (2d) 1043, 1045: "The question before us is: Does the record contain substantial evidence to support the judgment?" If it does, the judgment must be affirmed. (*Ferguson* v. *Standley,* 89 Mont. 489, 300 Pac. 245, and cases therein cited.)

In their brief, counsel for plaintiff abandon any claim to that portion of the stock originally secured by Meyers. Meyers' testimony is to the effect that he had no knowledge of any claim made by Wise to the stock in question. There is ample testimony to support the trial court's finding so far as Meyers is concerned, and the plaintiff has this to say in his brief: "Candor demands that we admit there was evidence to sustain the court's findings that Meyers was an innocent purchaser." It is their argument, though, that so far as the Zimmerman portion of the stock is concerned, there is no evidence to raise even a conflict, and that all of the evidence supports the plaintiff's view, sufficiently, at least, to require that the cause be returned to the trial court for a new trial as to the stock originally acquired by Zimmerman.

A determination of the question whether there was sufficient evidence before the lower court to raise a conflict will dispose of the errors specified. It is to be noted that much of the testimony of both Wise and Levinson concerns conversations held with Whitcomb, who was dead before the time of the trial, and Zimmerman who died some years before the trial.

It will be necessary to examine the testimony of each one of the witnesses to some extent satisfactorily to discuss the points raised in the exceptions and in the briefs. The plaintiff testified at some length and, as has been indicated, the portions of his testimony with the exception of conversations alleged to have been had with Meyers and Levinson, concern conversations he had with Zimmerman and Whitcomb—both of whom were dead prior to the time of trial. His testimony as to his conversation with Whitcomb is that some two months after the option agree-

ment between the representatives of the Phillips estate, and Meyers and Zimmerman, he visited Whitcomb and told him that he, Wise, had purchased a one-half interest in the Ruby Gold Mining Company stock in question, that he had not received it, and he wanted to know what became of it. In reply the testimony is: "Mr. Whitcomb says, 'I guess you have been gypped.'" This is the only testimony on the part of Wise as to any conversation with Whitcomb that would tend in any way to sustain plaintiff's contention. He testified that in November, 1927, he visited Zimmerman and told him that he thought he had been defrauded. In reply Wise testified Zimmerman said: "He told me that when I got my sheep deal closed with Monte Levinson he was satisfied I would get my stock." He further testified that on a later occasion he visited Zimmerman who took him to the office of Meyers, and had conversations there. Meyers on the stand denied ever having met Wise prior to the time of trial, and stated that so far as he could remember Wise had never visited his office. The balance of Wise's testimony concerns the arrangements made between himself and Levinson looking to the purchase of the stock in question.

It is significant that Wise testified the agreement between him and Levinson to purchase the stock was made in a conversation held in an automobile on the Grass Range road. Levinson on the stand could not recall any such conversation; however, he did testify there was a loose understanding between himself and Wise that the latter was to share the profits which might be gained in dealing in the stock in question.

Since neither Whitcomb nor Zimmerman was alive and there were no witnesses to the conversation between Wise, Zimmerman and Whitcomb, his testimony on these points is not expressly contradicted. Standing alone, however, it does not seem possible that these conversations could raise the constructive trust here sought to be proved. Although there was no express contradiction of Wise's testimony as to these conversations, his own actions are to a great extent inconsistent with the position he now advances. For example, the long delay in making any attempt to assert his claim by suit, which he at-

tempts to explain by the accounting suit, together with his interest in the proceedings, would warrant the lower court in finding a conflict. And, as we have said, it is doubtful that Wise's testimony, even if true, would be sufficient to raise the constructive trust.

The chief witness for the plaintiff besides himself was Monte Levinson, the former partner. Again it is argued that so far as Zimmerman's part of the deal is concerned, Levinson's testimony is uncontradicted, and again we have a situation where most of Levinson's testimony concerns conversations he had with Zimmerman, now dead.

At the outset in the examination of the testimony of Levinson it may be noted that the trial court was faced with a peculiar situation. Levinson, the former partner of Wise and one of the defendants, defaulted in the present case. In the accounting proceedings preceding the present action, he was represented by an attorney by the name of Allen. In the present case, Allen appears as an attorney for the plaintiff, and Levinson as one of his witnesses. Levinson had filed a claim based on this transaction against the Zimmerman estate which had not been paid, and he had some interest in the establishment of Wise's claim, as its establishment would fortify this claim. In that situation the lower court was justified in viewing the testimony of Levinson with some reservations as to its credibility.

The gist of Levinson's testimony is that he and Wise were interested in the Ruby Gulch Mining Company stock jointly; that they had made several trips to the mine and that he had procured a release of the verbal option held by Whitcomb; that after the negotiations had proceeded some time between the partners and the Phillips' interests, he met Zimmerman at Malta and in response to an inquiry from Zimmerman of the deal Levinson wanted on the mine, Levinson replied, "I said I would like to have you loan me the money to buy this mine with and let us pay you back and you can hold the stock or I would like to have you give me a certain percentage of this mine and you keep the balance of it. * * * And he said, 'I think it's all right. You can go ahead and make the deal.' " Levinson testified

further that he drove to Lewistown and saw Wise and told him that Zimmerman had promised to lend the money. When Zimmerman brought Meyers into the deal, Levinson's testimony is that in reply to a question put by him to Zimmerman as to why Meyers was brought along, he replied: "It's on account of that Wise angle."

There was some other testimony on the part of Levinson relative to knowledge on the part of Zimmerman that Wise had some interest in the deal in question, but the gist of all of Levinson's testimony is that Zimmerman agreed to lend to Wise and Levinson the money required to purchase the stock, and that Wise and Levinson might at any time obtain the stock by paying the original price, plus 6 per cent. interest.

The position taken by Levinson in his testimony is amply refuted, first, by the testimony of Meyers contradicting Levinson's testimony as to conversations alleged to have been had in Meyers' presence, and, second, the testimony is contradicted by a showing of the contractual relations evidenced by the memorandum and the agreement heretofore referred to, whereby it was agreed between Meyers and Zimmerman, on the one hand, and Levinson and McDonald, on the other, that Levinson and McDonald were to receive as compensation for their part in the transaction 25 per cent. of the profits accruing from the transaction. In addition to that, Levinson filed a creditor's claim on behalf of himself and the widow of McDonald in the Zimmerman estate for this 25 per cent. interest. He makes some explanation of these contracts on the stand by stating that the memorandum and agreement did not represent the original understanding. However, there is a sharp conflict between the situation shown by the memorandum and the contract and Levinson's conduct over more than ten years elapsing from the time the transaction was first entered into and the time of the trial, and the position he now takes. Further, although Levinson testified that Wise had an interest in the matter and, as has been said, his testimony is that the agreement was that Zimmerman and Meyers were to lend the partnership the funds with which to buy the stock, he said on the stand that in reporting the matter to Wise, he said: "I

didn't feel he [Wise] was entitled to fifty per cent. cut on the *profits* of that particular deal; and Wise said he thought he was, and I told him if he would be satisfied with a smaller amount, which I thought would be fair, around 25%—not to exceed that—that I would go ahead with this deal." Then followed an argument and "a little fight, and I left the office." That is the last Wise and Levinson saw of each other for several years. This latter testimony certainly does not bear out the theory of the loan transaction, nor that Wise was interested in any way from then on. Rather it supports the view that the real deal is shown by the memorandum and agreement between McDonald, and Levinson, on the one hand, and Zimmerman and Meyers, on the other. The fact of the fight and Levinson's acquisition of a new partner at this time indicates strongly that then Levinson had counted Wise out of the deal. This state of facts is inconsistent with the general view he advanced in other portions of his testimony. The conflicting positions warranted the lower court in finding as it did on the fact questions involved.

The witness Jacobson, called by the plaintiff, testified as to conversations had with Zimmerman in which the latter was supposed to have said to Jacobson, "By the way, Monte [referring to Levinson] has got this stock from the Ruby Gulch Mine and he would like to sell some to you;" and that after talking to Levinson, Jacobson visited Zimmerman again and Zimmerman was supposed to have said, "I am just holding for him his stock." This testimony tends to support the view of the plaintiff; however, no attempt was made to tie this testimony up with the original transaction, and we are left to conjecture as to how Levinson acquired the stock mentioned in the Jacobson conversation, and whether Levinson had it to sell under the memorandum and agreement from which he would make a profit, or as owner, and it, together with the Wise testimony, is totally insufficient to establish the cause of action here pleaded.

As we have said, the two positions taken by Levinson being mutually exclusive, the court was warranted in disregarding his testimony. The position taken by Wise during the period elapsing from the time of the original transaction and

434

his position taken on the stand are sufficiently contradictory to cast doubt on his testimony. His testimony, even if it were accepted as true, is scanty and incomplete, and the testimony of Wise and Jacobson together under the circumstances could not warrant recovery under the theory advanced on the trial.

In all of this opinion we have assumed that the testimony of Wise, Levinson and Jacobson relative to conversations had with Zimmerman and Whitcomb and other persons deceased at the time of the trial, was admissible, since the question was not argued in the briefs. However, in making that assumption, we are not passing upon the question of its admissibility. We have found, then, that the court was warranted in finding that there never was any scheme on the part of Zimmerman or Meyers to defraud this plaintiff, nor any knowledge on their part of Wise's alleged interest, and that the purchase price was paid by Zimmerman and Meyers. Since that is the case, a cause of action against the assignees of the original purchasers cannot be maintained.

Plaintiff urges that the defendant Trauerman and his assignees cannot take this stock as against Wise, for the reason that Trauerman and Wise were copartners, and that some two years before the assignments were made to Trauerman, he and Wise had some conversation concerning the stock and they agreed to purchase it. The evidence as to the conversation had between Trauerman and Wise, and a certain letter written by Trauerman to Wise, are totally insufficient to support the contention that there was a partnership between the two. The evidence is that the two never purchased or sold anything, and that it had no money or assets, and all of the evidence demonstrates conclusively that the findings of the court on this matter were justified.

What we have said above determines the matter and it is not necessary to discuss the specifications not considered in the opinion. The judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ANGSTMAN and ARNOLD concur.